# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 13, 2022

Lyle W. Cayce
Clerk

No. 21-50544

Brotherhood of Locomotive Engineers and Trainmen,

*Plaintiff—Appellee,*

*versus*

Union Pacific Railroad Company,

*Defendant—Appellant.*

Appeal from the United States District Court
for the Western District of Texas, El Paso
USDC No. 3:21-CV-122

Before Dennis, Higginson, and Costa, *Circuit Judges.*

Gregg Costa, *Circuit Judge*:

The Railway Labor Act divests federal courts of jurisdiction over minor disputes between rail carriers and their employees. Most claims challenging employee discipline qualify as minor disputes that must be routed through arbitration. But there are exceptions. One is that the Act gives federal courts the authority to remedy carrier conduct motivated by antiunion animus. The district court found that this was such a case, preliminarily enjoining the railroad's suspension of six union members—including all five actively-employed officers of the union's local division—

No. 21-50544

over a fistfight at an offsite union meeting. Our primary question is whether the animus exception gave the district court jurisdiction to intervene.

I

Union Pacific is a national rail carrier operating in the western half of the United States. The Brotherhood of Locomotive Engineers and Trainmen is a labor union representing over 5,000 Union Pacific engineers. The union is made up of a number of local units or "divisions." Each provides representation to union members in its area. Elected representatives from each division also serve on general committees, which together negotiate collective bargaining agreements (CBAs) with carriers like Union Pacific.

Division 192 is the exclusive representative for Union Pacific employees in and around El Paso. During early 2021, tension arose within the division over the union's stance on "shoves." Engineers take shoves when they accept extra shifts at the request of the railroad. The CBA does not prohibit shoves, but the union views them as a safety risk and has asked its members to decline them. Not all of the division's members complied. One engineer in particular, David Cisneros, continued taking shoves. Two Division 192 officers—Local Chairman Peter Shepard and Vice Local Chairman Joe Reyes—confronted Cisneros about his behavior via text message and the division's Facebook page.

Mounting tensions ultimately erupted into an off-duty fist fight before a union meeting. Details about the fight are disputed but the record largely establishes the following.[1]

---

[1] As the district court explained, the particulars of the fight are not material. The union's RLA claim turns on undisputed facts about Union Pacific's response to the fight.

2

No. 21-50544

On March 9, 2021, Division 192 held a routine union meeting at a local restaurant. Cisneros arrived at the restaurant a half hour before the start time. A number of the division's officers, including Shepard and Reyes, had already arrived and were chatting in the parking lot. Cisneros approached Reyes and struck him repeatedly until he fell to the ground. Shepard and other division members attempted to separate the parties and a shouting match ensued. In the tumult, Cisneros crossed back over to Reyes, who had just risen to his feet, and punched him until he collapsed again. The two were finally separated and the union meeting took place without Cisneros or Reyes.

Almost two months later, on May 5, Cisneros filed a complaint with Union Pacific, alleging that he had been threatened and physically assaulted by Shepard and Reyes in retaliation for taking extra shifts. A company supervisor met with Cisneros about the incident and took statements from only two other employees: Jason Barnett and Mark Fraire. Barnett wrote that he had witnessed part of the altercation at the union meeting and helped to diffuse the situation. Fraire was not present for the fight but said that he also took shoves and had been subject to similar harassment by Reyes.

About a week later, Union Pacific indefinitely suspended Shepard and Reyes without pay. It also suspended three other officers of Division 192 and one more union member. Cisneros's initial report to Union Pacific did not allege that those four were directly involved in the fight, and it appears they were simply bystanders. Union Pacific did not take statements from any of the suspended union members before disciplining them.

Notices of Investigations issued to all six individuals, telling them that they would be subject to disciplinary proceedings that could result in termination. Shepard and Reyes were charged with violating two Union Pacific policies: Item 10-I (forbidding "Violence & Abusive Behavior in the

No. 21-50544

Workplace") and Rule 1.6 (forbidding "Discourteous," "Immoral," and "Quarrelsome" behavior). The bystanders were charged with violating Rule 1.6—in their case, for "fail[ing] to take any action" to stop the fight or "report the incident" to management.

Cisneros was not suspended or issued a notice, even though it is Union Pacific's policy to discipline every participant in a physical altercation. Union Pacific also declined to discipline Barnett, who gave a statement in support of Cisneros's claim, although he had not made any earlier efforts to report the incident.

The suspension of six union members—five of whom held office— effectively barred all of Division 192's leadership from Union Pacific's premises.[2] The suspended officers later testified that this damaged Division 192 because they could not perform most duties remotely.

Within days of the suspensions, the union sued Union Pacific in federal court. It alleged that Union Pacific was retaliating against the union for its shove policy by debilitating the union officers who sought to enforce it. This retaliation, the union argued, violated the section of the Railway Labor Act (RLA) that prohibits carrier interference with union activity. The union sought injunctive relief requiring Union Pacific to end its investigation of the suspended employees and ordering their return to work. Union Pacific responded with a motion to dismiss for lack of subject matter jurisdiction, arguing that the dispute needed to be arbitrated.

The district court held a preliminary injunction hearing. The union introduced the testimony of two suspended union members and the General Chairman of its western territory, as well as a number of documents. Union

---

[2] The only remaining union officer, Steve Seale, was on medical leave at the time.

No. 21-50544

Pacific offered, among other things, the testimony of Cisneros and two Union Pacific supervisors involved in the disciplinary action. The day after the hearing, the court granted a preliminary injunction, finding a "strong likelihood" the union would prevail in showing that Union Pacific violated the RLA.

Union Pacific immediately appealed the injunction and unsuccessfully sought a stay in this court.

Meanwhile, the district court denied Union Pacific's motion to dismiss for lack of jurisdiction. It acknowledged that the RLA precludes federal jurisdiction over minor disputes between carriers and their employees. But it concluded that Union Pacific had used its disciplinary proceedings "as pretext for undermining" the union. The case thus presented, in the court's view, an "exceptional circumstance" of antiunion animus in which federal court jurisdiction exists.

## II

The first question is whether the district court had jurisdiction. *See Jefferson Cmty. Health Care Ctrs., Inc. v. Jefferson Par. Gov't*, 849 F.3d 615, 621 (5th Cir. 2017) (addressing jurisdiction in appeal of preliminary injunction).

Congress enacted the RLA to minimize disruptions to railway service caused by labor disputes. *See Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1994). The Act establishes distinct procedures for resolving "major" and "minor" disputes between carriers and their employees. *Id.* at 252–53. "Major disputes," which relate to the collective bargaining process, give rise to federal court jurisdiction. *See Conrail v. Railway Labor Executives' Association*, 491 U.S. 299, 302–03 (1989); *see also Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711, 723 (1945) (describing major disputes as ones that

"relate[] to disputes over the formation of collective agreements or efforts to secure them"). On the other hand, most "minor disputes" or grievances must be arbitrated before administrative bodies called Adjustment Boards. *Conrail*, 491 U.S. at 303–04. Minor disputes typically involve "the interpretation or application of agreements concerning rates of pay, rules, or working conditions." *Conrail*, 491 U.S. at 303. The "distinguishing feature" of a minor dispute is that it "may be conclusively resolved by interpreting the existing agreement." *Id.* at 305.

Not all disputes that might be governed by an existing CBA require arbitration. Federal courts sometimes have a role, such as when carriers act out of "anti-union animus." *Association of Professional Flight Attendants v. Am. Airlines, Inc.*, 843 F.2d 209, 211 (5th Cir. 1988); Douglas Hall et al., THE RAILWAY LABOR ACT, § 5.III.A (4th ed. 2016) (explaining that, once a CBA is in place, "courts exercise jurisdiction principally to address claims that carrier actions reflect antiunion animus or undermine the effective functioning of the union or cannot be adequately remedied by administrative means"). The animus exception encompasses direct attacks on the union, as well as more clandestine attempts to punish employees for their union associations. *See, e.g.*, *Air Line Pilots Association, International v. Transamerica Airlines, Inc.*, 817 F.2d 510, 515–17 (9th Cir. 1987) (carrier's diversion of business to a newly established non-union subsidiary); *Railway Labor Executives' Association v. Bos. & Me. Corp.*, 808 F.2d 150, 157–58 (1st Cir. 1986) (discriminatory treatment of every employee who chose to strike); *Conrad v. Delta Air Lines, Inc.*, 494 F.2d 914, 918 (7th Cir. 1974) (retaliatory discharge of a single employee).

The animus exception is rooted in Section 2 of the RLA, which provides that no carrier "shall in any way interfere with, influence, or

coerce" the employees in their "choice of representatives."[3]   45 U.S.C.
§ 152.  That requirement and similar provisions of the RLA are judicially
enforceable because noninterference with employees' chosen representation
is a statutory right crucial to the Act's functioning.  *Virginian Ry. Co. v.
System Federation*, 300 U.S. 515, 545–46 (1937); *Tex. & N. O. R. Co. v.
Brotherhood of Railway & Steamship Clerks*, 281 U.S. 548, 569 (1930).

We first addressed the animus exception sixty years ago.  *See
Brotherhood of Railroad Trainmen v. Cent. of Ga. Ry. Co* ("*Central of
Georgia*"), 305 F.2d 605 (5th Cir. 1962).  A railroad had started disciplinary
proceedings against an employee who was a local union representative,
alleging that his efforts to encourage other employees to pursue workers'
compensation claims constituted "gross disloyalty."  *Id.* at 606.  The union
sought a federal court injunction, claiming the railroad was (1) violating the
employee's contractual rights by disciplining him for conduct that was not
prohibited by the CBA and (2) interfering with the union by using a baseless
charge as pretext to terminate the employee "and thereby to disqualify him
as a representative."  *Id.* at 606–07.  We explained that the district court
lacked jurisdiction over the first claim because it could be resolved by
interpreting the employee's "personal rights" under the CBA and was thus
a minor dispute.  *Id.* at 607.  In contrast, federal court jurisdiction existed over
the claim that the railroad was "frustrat[ing] and undermin[ing] the
effectiveness of [the] bargaining agent by securing his discharge for
unfounded, false or baseless charges."  *Id.* at 608–09.  If it was true that the
railroad had used its "disciplinary proceedings as a guise for . . . undermining
the effectiveness of the Brotherhood," then the railroad had "obviously"

---

[3] Applying the animus exception, courts look to the third subpart of Section 2 (cited above), as well as the fourth subpart, which protect employees' right to organize and operate their union free from carrier interference.  *See* 45 U.S.C. § 152.

violated Section 2, Third, of the RLA. *Id.* at 609. In that case, a federal court injunction would be "appropriate if not compelled." *Id.*; *see also Steele v. Louisville & N. R. Co.*, 323 U.S. 192, 207 (1944) (finding injunctive relief appropriate to remedy conduct that undermined the RLA's bargaining scheme).

*Central of Georgia* looks a lot like this case. The suspended employees are elected officers of their local union division, who were disciplined after attempting to persuade their peers to adopt a pro-union position in a policy dispute. The employees are charged with violating vague provisions of the carrier's code of conduct. And once again the union alleges that the charges are pretext for a plot to inhibit the employees' ability to act as union representatives and thereby weaken the union.

Despite the similarities, Union Pacific argues that *Central of Georgia* is not controlling because its holding was diluted, if not entirely gutted, by *Trans World Airlines, Inc. v. Independent Federation of Flight Attendants*, 489 U.S. 426 (1989) ("*TWA*"). *TWA* clarifies that Section 2, Fourth, of the RLA addresses "primarily the precertification rights and freedoms of unorganized employees" and is not usually grounds for judicial intervention once the union has been certified. *Id.* Union Pacific reads this as meaning *Central of Georgia* no longer applies to animus claims raised by certified unions.

Union Pacific overstates the impact of *TWA* on *Central of Georgia* and its kin. Soon after *TWA* issued, we reiterated that "actions taken by a carrier for the purpose of weakening or destroying the union" remain a "special circumstance[] in which federal courts may assert jurisdiction over cases that would otherwise involve minor disputes." *Brotherhood of Railway. Carmen v. Atchison, T. & S. F. R. Co.*, 894 F.2d 1463, 1468 n.10 (5th Cir. 1990) (citing *Central of Georgia*, 305 F.2d at 608–09). In line with that reaffirmation, district courts in this circuit continue to apply *Central of Georgia*. *See*

No. 21-50544

*CareFlite v. Office and Professional Employees. International Union*, 766 F. Supp. 2d 773, 778–79 (N.D. Tex. 2011); *PHI, Inc. v. Office & Professional Employees Internationl Union*, 2007 U.S. Dist. LEXIS 85085, at *21–27 (W.D. La. Nov. 16, 2007). Other circuits to address the animus exception since *TWA* have recognized its vitality.[4] *See Stewart v. Spirit Airlines, Inc.,* 503 F. App'x 814, 819 (11th Cir. 2013); *United Transportation Union v. AMTRAK*, 588 F.3d 805, 813 (2d Cir. 2009); *Wightman v. Springfield Terminal Ry.*, 100 F.3d 228, 234 (1st Cir. 1996); *Fennessy v. Sw. Airlines*, 91 F.3d 1359, 1362–63 (9th Cir. 1996); *Brotherhood of Locomotive Engineers v. Kan. City S. Ry.*, 26 F.3d 787, 795 (8th Cir. 1994); *Davies v. Am. Airlines, Inc.*, 971 F.2d 463, 468 (10th Cir. 1992); *but see IBT v. UPS Co.*, 447 F.3d 491, 502 (6th Cir. 2006) (acknowledging other circuits' adoption of the animus exception but reserving the issue for a future case). The treatise focused on the RLA also recognizes that courts can exercise jurisdiction over a disciplinary proceeding that "raises issues that can be resolved by interpretation of a [CBA]" if "the plaintiff can demonstrate antiunion animus or antiunion discrimination."

---

[4] In the immediate aftermath of *TWA*, one circuit opinion suggested that the Supreme Court decision might affect the animus doctrine. *Central of Georgia*'s author, Judge Brown, wrote an opinion as a visiting judge on the First Circuit, wondering whether his earlier ruling gave "sufficient deference" to the RLA's preference for arbitration in the postcertification context. *Nat'l R. Passenger Corp. v. International Association of Machinists & Aerospace Workers*, 915 F.2d 43, 53 n.15 (1st Cir. 1990). But Judge Brown's reservations did not gain traction in the courts. As mentioned above, courts (including the First Circuit) and commentators continue to recognize that the animus exception applies to postcertification disputes. *See, e.g.*, *Wightman v. Springfield Terminal Ry.*, 100 F.3d 228, 234 (1st Cir. 1996) ("[W]e will intervene [in postcertification disputes] upon demonstration of carrier conduct reflecting anti-union animus, an attempt to interfere with employee choice of collective bargaining representative, discrimination, or coercion."). Indeed, the Second Circuit has persuasively explained that *TWA* is consistent with the well-recognized principle that antiunion animus is one of the few circumstances in which "a postcertification suit may be brought in federal court." *See United Transportation Union v. AMTRAK*, 588 F.3d 805, 813 (2d Cir. 2009).

No. 21-50544

Hall et al., *supra*, at § 5.III.D.4; *see also* ALI-ABA Continuing Legal Education, *Judicial Enforcement of the Railway Labor Act*, SS051 ALI-ABA 483, 501 (2011) ("Courts have jurisdiction over adequately pleaded coercion claims and may grant injunctive relief, notwithstanding the existence of a minor dispute, if such claims are borne out by the facts.").

It makes sense that no court has read *TWA* as overriding the animus exception. A Supreme Court decision overrules circuit precedent only when it does so "unequivocal[ly]." *United States v. Alcantar*, 733 F.3d 143, 146 (5th Cir. 2013). *TWA* did not involve any claim that a carrier had hidden an attempt to weaken a union behind a facially minor dispute. The *TWA* parties had just concluded a very public battle over the terms of their new CBA. *See* 489 U.S. at 429. They had already exhausted the administrative procedures mandated by the RLA and, at that the stage, the Court held only that the Act did not prohibit the carrier's adoption of self-help measures, which were not "inherently destructive" of union activity or the framework of the RLA. *See id.* at 442. *TWA* did not address a situation in which there was "discrimination or coercion against the representative," which can result in a breakdown of the "essential framework for bargaining." *See Association of Professional Flight Attendants*, 843 F.2d at 211. Nor was it interpreting Section 2, Third, of the RLA—the provision we applied in recognizing the animus exception. *See Central of Georgia*, 305 F.2d at 608.

Animus claims like the one at bar may be litigated in federal court because they cannot "be conclusively resolved" by interpreting or applying a CBA. *See Conrail*, 491 U.S. at 305; *Andrews*, 406 U.S. at 324 (qualifying an employee's wrongful discharge claim as a minor dispute because it "stem[med] from differing interpretations of the collective-bargaining agreement"). Unlike an employee's "personal" claim challenging discipline, which can be fully resolved by interpreting and applying the CBA and thus must be arbitrated, *see Central of Georgia*, 305 F.2d at 607–08, the

animus claim is a statutory right neither created nor defined by the parties' contract. The question to be answered in this case, for example, is whether the railroad interfered with the employees' choice of representation. 45 U.S.C. § 152. That is a statutory question, not a contractual one. The Supreme Court has long recognized that "but for the general jurisdiction of the federal courts there would be no remedy to enforce the statutory commands which Congress has written into the Railway Labor Act." *Switchmen's Union of N. Am. v. Nat'l Mediation Bd.*, 320 U.S. 297, 300 (1943). It has confirmed that principle since *TWA*, explaining that "the RLA's mechanism for resolving minor disputes does not pre-empt causes of action to enforce rights that are independent of the CBA." *Hawaiian Airlines*, 512 U.S. at 256; *see also Fennessy*, 91 F.3d at 1362 (finding judicial enforcement of animus claims to be consistent with *Hawaiian Airlines*).[5]

Union Pacific also argues that "[a] preliminary injunction may be issued in a case involving a minor dispute only in exceptional circumstances." *See Allied Pilots Association v. Am. Airlines, Inc.*, 898 F.2d 462, 465 (5th Cir. 1990) (instructing that injunctions should only be granted in minor disputes "where necessary to preserve the jurisdiction of the grievance procedure, or where a disruption of the status quo would result in irreparable injury . . ." (quoting *IBT, Local 19 v. Sw. Airlines Co.*, 875 F.2d 1129, 1136 (5th Cir. 1989)). But this is just another way of framing the RLA's general prohibition against judicial intervention in minor disputes. We have

---

[5] In cases declining to apply the animus exception, the proper interpretation of a CBA term was "[t]he crux of the dispute." *See, e.g.*, *Am. Airlines*, 843 F.2d at 212 (qualifying a dispute over a carrier's refusal to let employees wear a controversial button as minor because it turned on the meaning of the dress code in the CBA); *Brotherhood of Railway Carmen*, 894 F.2d at 1467 (affirming dismissal of a claim about a carrier's voluntary resignation program because it "turn[ed] on interpretation of the contractual agreements between the parties").

No. 21-50544

explained that antiunion animus is one of the "exceptional circumstances" that warrants federal jurisdiction. *Brotherhood of Railway Carmen*, 894 F.2d at 1468 n.10. Indeed, the district court deemed Union Pacific's selective discipline suspending five division leaders an "exceptional circumstance" warranting court intervention. And, once a court has jurisdiction to intervene in a dispute governed by the RLA, there is no heightened standard for injunctive relief. *See Conrail*, 491 U.S. at 302–03 (explaining that violations of the statutory requirements of the RLA may be enjoined "without the customary showing of irreparable injury").[6]

Federal courts thus have jurisdiction over postcertification disputes alleging that railroad conduct motivated by antiunion animus is interfering with the employees' "choice of representatives."[7] *See* 45 U.S.C. § 152; *Central of Georgia*, 305 F.2d at 608–09.

---

[6] Union Pacific also maintains that the Norris-LaGuardia Act (NLGA) prohibits courts from granting injunctions in labor disputes without first finding the enjoined action would cause "substantial and irreparable injury" to the moving party. 29 U.S.C. § 107(b). But the NLGA "expresses a basic policy against the injunction of activities of labor unions. . . . [It] does not deprive the federal courts of jurisdiction to enjoin compliance with various mandates of the Railway Labor Act." *Chi. & N. W. Ry. Co. v. United Transportation Union*, 402 U.S. 570, 581 (1971). To accommodate the "competing demands" between these statutes, the Supreme Court and this court have repeatedly held that courts enforcing the RLA are not required to follow the NLGA's procedures. *See, e.g.*, *Burlington N. R.R. Co. v. Brotherhood of Maintenance of Way Employes*, 481 U.S. 429, 445 (1987); *BNSF Ry. Co. v. SMART*, 973 F.3d 326, 338 (5th Cir. 2020).

[7] Of course, jurisdiction does not depend on the claim being successful. A plaintiff need only allege a "colorable" claim over which there is federal jurisdiction to allow a federal court to decide the dispute. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 513 (2006); *see OJSC Ukrnafta v. Carpatsky Petrol. Corp.*, 957 F.3d 487, 496 (5th Cir. 2020) ("[T]he plaintiff need not, and often will not, succeed on the federal claim for a federal court to be able to decide it."); *see also Central of Georgia*, 305 F.2d at 609 (recognizing that federal district court had jurisdiction over animus claim and remanding so it could consider whether union proved that claim).

No. 21-50544

III

That leaves the factbound question of whether Union Pacific engaged in that unlawful interference when it suspended the five union officers. We review the grant of a preliminary injunction for abuse of discretion. *See Basinkeeper v. U.S. Army Corps of Eng'rs*, 894 F.3d 692, 696 (5th Cir. 2018). Factual findings that support the injunction are reviewed for clear error while legal rulings are reviewed *de novo. See id.* Deference is especially warranted on the question of antiunion animus. *See Independent Union of Flight Attendants v. Pan Am. World Airways, Inc.*, 789 F.2d 139, 143 (2d Cir. 1986) (noting reluctance "to overturn district court findings as to motive or intent" in this area).

Although the district court found all elements of a traditional preliminary injunction satisfied, Union Pacific focuses only on whether the union showed a substantial likelihood of success on its interference claim. And most of its challenge to substantial likelihood of success is rooted in the jurisdictional argument we have already addressed. Beyond the jurisdictional issue, the propriety of the injunction largely boils down to a factual dispute: Did the district court abuse its discretion in concluding that the disciplining of six union members, including five officers, likely was pretext for the railroad's efforts to "interfere with, influence, or coerce" employees in their choice of representatives. 45 U.S.C. § 152 (Third).

We see no abuse of discretion. The district court concluded that the union was likely to succeed in showing that the discipline was "motivated by a desire to weaken the local division." The following facts amply support that determination: (1) Union Pacific indefinitely suspended all of Division 192's active-duty leadership because of a dispute they had with an employee who favored the company's position in a policy dispute; (2) Union Pacific premised the discipline on a fight that occurred off-duty and outside the

No. 21-50544

workplace, even though four of the suspended union officials did not participate in the fight; (3) the pro-company employee who started the fight was not disciplined, despite the company's policy of disciplining all participants in a physical altercation; and (4) Union Pacific took a statement from the pro-company employee but did not take a statement from the union officials before suspending them. Indeed, the railroad's suspension of effectively all of Division 192's elected leadership presents a much stronger case of interference with the employees' choice of representatives than the case recognizing such a claim. *Contrast Central of Georgia*, 305 F.2d at 609 (recognizing that pretextual disciplining of even one employee can state an interference claim); *see also Conrad*, 494 F.2d at 918 ("Anti-union motivation invalidates even a discharge which could be justified on independent grounds.").

Unable to dispute most of these facts, Union Pacific argues that an interference claim needs to undermine the entire union, not just a local unit like Division 192. No authority supports that view. Before and after *TWA*, courts exercised jurisdiction over interference claims involving disciplinary actions that targeted an individual union representative or a particular union branch. *See, e.g.*, *Central of Georgia*, 305 F.2d at 606; *Conrad*, 494 F.2d at 918; *Fennessy*, 91 F.3d at 1363. Nor does the RLA's text create a national/local distinction. It says that carriers shall not "seek in any manner" to interfere with employees' "choice of representatives"; there is no mention of particular offices or duties those representatives must have. 45 U.S.C. § 152(3).

The district court did not abuse its discretion in concluding that the union is likely to prevail in showing that Union Pacific's suspension of effectively all the division's elected representatives amounted to the interference the RLA prohibits.

No. 21-50544

\* \* \*

We AFFIRM the injunction.