# United States Court of Appeals

*for the*

# Fifth Circuit

---

Case No. 21-50544

BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN,

*Plaintiff-Appellee,*

v.

UNION PACIFIC RAILROAD COMPANY,

*Defendant-Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS, EL PASO IN NO. 3:21-CV-122,
HONORABLE DAVID BRIONES, U.S. DISTRICT JUDGE

## PETITION FOR REHEARING *EN BANC*

ROBERT S. HAWKINS
ANDREW J. ROLFES
MICHAEL B. DE LEEUW
TAMAR S. WISE
ANDREW D. LINZ
COZEN O'CONNOR
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, Pennsylvania 19103
(215) 665-2000
rhawkins@cozen.com
arolfes@cozen.com
mdeleeuw@cozen.com
twise@cozen.com
alinz@cozen.com
*Attorneys for Defendant-Appellant*

## **CERTIFICATE OF INTERESTED PERSONS**

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

Appellant, Union Pacific Railroad Company ("Union Pacific"), states that it is a non-governmental corporate party and a wholly-owned subsidiary of Union Pacific Corporation, a Utah corporation. Union Pacific Corporation is publicly traded on the New York Stock Exchange.

Other persons and/or associations that may have an interest in the outcome of this case are:

> Brotherhood of Locomotive Engineers and Trainmen (an
>
> unincorporated labor organization).

And, the following natural persons:

> Peter Shepard
>
> David Butler
>
> John Moye
>
> Jose Reyes
>
> Kevin Seale
>
> Joseph Telehany

i

# FED. R. APP. P. 35(b)(1) STATEMENT

The Railway Labor Act (the "**RLA**") requires that "minor disputes" be resolved in arbitration by expert arbitration tribunals—subject to extremely narrow and limited exceptions. The Panel affirmed the district court's decision that the underlying minor dispute (arising from disciplinary charges against employees involved in a fistfight) qualified as one of those extremely narrow exceptions. The Panel's ruling was predicated on a sixty year-old case in this Circuit, *Brotherhood of Railroad Trainmen v. Cent. of Ga. Ry. Co.*, 305 F.2d 605 (5th Cir. 1962) ("***Central of Georgia***"), which allowed a minor disciplinary dispute to be heard in federal court—instead of arbitration—because the Court concluded that allegations of anti-union animus fell within the RLA's statutory protections. But courts have limited the scope of those statutory protections; *Central of Georgia* is consequently no longer viable and should be overruled.

This case raises an issue of exceptional importance that meets the requirements of Fed. R. App. P. 35(a) and therefore merits consideration by the full Court. Since this Court decided *Central of Georgia*, its central premise—relied upon by the Panel to reach its ruling—has been thoroughly undermined by the Supreme Court and by subsequent decisions by this and other Courts of Appeals (including a repudiation by its own author, Judge John R. Brown, when he was sitting by designation on the First Circuit). Specifically, in *Trans World Airlines, Inc. v.*

*Independent Federation of Flight Attendants*, 489 U.S. 426 (1989) ("__*TWA*__"), the Supreme Court clarified that federal court jurisdiction under the RLA is primarily restricted to disputes that arise *before a union is certified*, when workers are unrepresented and without union protection. The Panel's reliance on and extension of *Central of Georgia* conflicts with that decision and its progeny. Rehearing is necessary reassess the anachronistic holding of *Central of Georgia*.

Moreover the Panel's approach, if left to stand, would create an unbounded exception to mandatory arbitration that would swallow the rule. The Panel allowed an "animus exception" to mandatory arbitration, under which any facially plausible allegation that employer's "conduct [is] motivated by antiunion animus [and] is interfering with the employees' 'choice of representatives'" would be sufficient to avoid arbitration and confer federal jurisdiction. Op. at 12. Federal courts would then have jurisdiction over any case where a creative lawyer could plausibly include allegations of "anti-union animus." Expect many such allegations.

This novel approach to the RLA conflicts with all established authority about the limited ability to avoid mandatory arbitration and would create a circuit split. No other Circuit has held that mere allegations that an employer's anti-union bias motivated a disciplinary action, without more, would satisfy this limited exception.

This case allows the Court an occasion to reconsider the continued validity of *Central of Georgia* in light of intervening developments in the law and also

illustrates the troubling consequences of adopting an "animus exception" that would fill the federal courts with post-certification disciplinary disputes—disputes that Congress intended to be heard in binding arbitration under the RLA.

# **TABLE OF CONTENTS**

**Page**

CERTIFICATE OF INTERESTED PERSONS ......................................... i

FED. R. APP. P. 35(b)(1) STATEMENT ................................................. ii

TABLE OF CONTENTS .................................................................v

TABLE OF AUTHORITIES .................................................. vi

STATEMENT OF THE ISSUES....................................................1

STATEMENT OF FACTS AND COURSE OF PROCEEDINGS..........................1

ARGUMENT .......................................................................3

   A.    This Court Should Overrule *Central of Georgia* .........................3

   B.    A Freestanding "Animus Exception" Would Create a Circuit Split...........9

CONCLUSION ....................................................................13

CERTIFICATE OF SERVICE ..............................................14

CERTIFICATE OF COMPLIANCE....................................................15

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*Andrews v. Louisville & Nashville R. Co.*,
406 U.S. 320 (1972)................................................................6

*Ass'n of Professional Flight Attendants v. American Airlines, Inc.*,
843 F.2d 209 (5th Cir. 1988) ........................................ 8-11

*Ass'n of Flight Attendants v. Horizon Air Indust., Inc.*,
280 F.3d 901 (9th Cir. 2002) ...........................................7

*Bhd. of Maint. of Way Emps. Div./IBT v. BNSF Ry. Co.*,
834 F.3d 1071 (9th Cir. 2016) ..........................................7

*Bhd. of R.R. Trainmen v. Central of Georgia Ry.*,
305 F.2d 605 (5th Cir. 1962) ....................................*passim*

*Consolidated Rail Corp. v. Ry. Labor Executives' Ass'n*,
491 U.S. 299 (1989)................................................................4

*Grand Trunk Western R.R. Co.*,
12 NMB 228 (June 27, 1985) .........................................10

*Hawaiian Airlines, Inc. v. Norris*,
512 U.S. 246 (1994)................................................................4

*Indep. Union of Flight Attendants v. Pan Am. World Airways, Inc.*,
789 F.2d 139 (2d Cir. 1986) ...............................................7

*International Ass'n of Machinists & Aerospace Workers v. Northwest
Airlines, Inc.*,
673 F.2d 700 (3d Cir. 1982) ...............................................7

*Johnson v. Express One Int'l, Inc.*,
944 F.2d 247 (5th Cir. 1991) ...........................................11

*Nat'l R.R. Passenger Corp. v. Int'l Ass'n of Machinists and Aerospace
Workers*,
915 F.2d 43 (1st Cir. 1990)........................................... 6-7

*Planned Parenthood of Greater Tex. Family Planning & Preventative Health Serv., Inc. v. Kauffman*,
981 F.3d 347 (5th Cir. 2020) ...................................................................3

*Ry. Labor Execs.' Ass'n v. Boston & Maine Corp.*,
808 F.2d 150 (1st Cir. 1986)....................................................................8

*Trans World Airlines, Inc. v. Indep. Fed'n of Flight Attendants*,
489 U.S. 426 (1989)................................................................ iii, 1, 5

*Union Pac. R.R. Co. v. Sheehan*,
439 U.S. 89 (1978)................................................................ 12-13

*United Parcel Service, Inc.*,
369 N.L.R.B. No. 1 (Dec. 23, 2019)........................................................12

*United Transp. Union v. Nat'l R.R. Passenger Corp.*,
588 F.3d 805 (2d Cir. 2009) .......................................................7, 10

*Wightman v. Springfield Term. Ry. Co.*,
100 F.3d 228 (1st Cir. 1996).................................................................5

**Statutes**

29 U.S.C §151.................................................................................12

45 U.S.C. § 151...............................................................................1

45 U.S.C. §§ 152 Third and Fourth ................................................ 1, 4-5

45 U.S.C. § 153..............................................................................4

45 U.S.C. §§ 154-55..........................................................................4

## STATEMENT OF THE ISSUES

Whether *Central of Georgia* should be overruled in light of the intervening decisions of the Supreme Court and this Court that significantly curtailed federal court jurisdiction over post-certification disputes between carriers and their unionized employees under Sections 2 Third and Fourth of the RLA, 45 U.S.C. §§ 152 Third, 152 Fourth. *See TWA*, 489 U.S. at 440 (holding these statutory protections for employees' choice of union representative apply "primarily to the precertification rights and freedoms of unorganized employees").

## STATEMENT OF FACTS AND COURSE OF PROCEEDINGS

This case arises out of a post-certification labor dispute under the Railway Labor Act, 45 U.S.C. § 151, *et seq*., between Appellant, Union Pacific Railroad Company, and Appellee, the Brotherhood of Locomotive Engineers and Trainmen ("**BLET**").

On May 28, 2021, BLET filed a Verified Complaint seeking preliminary and permanent injunctive relief to enjoin Union Pacific from proceeding with disciplinary investigations involving six employees (five of whom are officials of a local division of BLET based in El Paso, Texas) who were involved in or witnessed a fight in a parking lot outside a restaurant where a local union meeting was to be held on March 9, 2021. (ROA.8-27). The disciplinary process for employees represented by BLET on Union Pacific is governed by a collectively-bargained

"Discipline Rule." (ROA.555-556). BLET's Complaint alleged that Union Pacific violated Sections 2 Third and 2 Fourth of the RLA by issuing notices of investigation to these six employees and removing them from service pending an investigation because, the union alleged, Union Pacific acted with "anti-union animus" in an effort to undermine the functioning of the BLET local division in El Paso. (ROA.18). On May 31, 2021, BLET filed a motion seeking a temporary restraining order and a preliminary injunction prohibiting Union Pacific from proceeding with the planned investigations for the six employees, and ordering Union Pacific to return those employees to work. (ROA.29-35).

The District Court issued a TRO on June 2, 2021, and held a hearing on BLET's motion for a preliminary injunction on June 10, 2021. The record at the hearing included evidence that, *inter alia*: BLET has more than 600 union officers representing over 5,000 Union Pacific engineers, (ROA.618); *none of the charged union officers participate in collective bargaining*, (ROA.554); the disciplinary investigation Union Pacific initiated was enjoined before it could proceed, (ROA.632-635, 640); and there was no dispute that, if Union Pacific eventually disciplined the charged employees, the grievance and RLA arbitration processes remained available and would afford them the ability to seek full relief, (ROA.559, 622). The District Court granted BLET's motion, (ROA.347-351), and Union Pacific appealed.

On April 13, 2022, a panel of this court affirmed the District Court's injunction in a published opinion ("**Op.**").  The Panel concluded that the District Court properly exercised jurisdiction because BLET's Complaint alleged that Union Pacific's conduct was motivated by "antiunion animus."  Op. at 12.  It reasoned that *Central of Georgia* established that disciplinary proceedings initiated to "undermin[e] the effectiveness" of the union violated statutory rights under the RLA and implicated federal court jurisdiction.  Op. at 7-8.  On the merits, the Panel concluded that the district court had not abused its discretion and affirmed the injunction.  Op. at 13-14.

## ARGUMENT

### A.    This Court Should Overrule *Central of Georgia*

En banc rehearing is warranted in this case for at least two reasons.  First, *Central of Georgia*, decided in 1962, should be reconsidered—a step that this Court may take only when sitting en banc.  *See Planned Parenthood of Greater Tex. Family Planning & Preventative Health Serv., Inc. v. Kauffman*, 981 F.3d 347, 383 (5th Cir. 2020) ("[R]econsideration of circuit—especially panel—precedent is one of the main purposes of *en banc* rehearings.").

*Central of Georgia*'s permissive approach to federal court jurisdiction over minor disputes between employers and railroad unions *after* a union has been

certified cannot be squared with more recent Supreme Court precedent.[1]  Subsequent

decisions of both this Court and its sister Circuits, all of which emphasize the RLA's

limits on federal court jurisdiction, stand in sharp contrast to *Central of Georgia*'s

expansive approach.

Indeed, before this case, no Court of Appeals decision had read the RLA to

allow federal court jurisdiction over post-certification disciplinary disputes based

solely on claims of antiunion animus.  That reading of the RLA is flatly inconsistent

with the Supreme Court's decision in *TWA* and the majority of this Court's

jurisprudence.  To the extent *Central of Georgia* may be read to support such an

interpretation, it should be overruled explicitly.

In *Central of Georgia*, a panel of this Court interpreted Section 2 Third of the

RLA, which prohibits a railroad from "in any way interfere[ing] with, influenc[ing],

or coerc[ing]" employees in their "choice of representatives," 45 U.S.C. § 152 Third,

---

[1] As the Panel noted, Congress established a two-part framework under the RLA for resolving post-certification railroad labor disputes.  Op. at 5.  This framework—as interpreted by the courts—distinguishes between "major" and "minor" disputes.  *See Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1994).  "Major disputes" are those that relate to the formation of collective bargaining agreements or efforts to change them, and are mediated before the National Mediation Board.  45 U.S.C. §§ 154-55; *see Consolidated Rail Corp. v. Railway Labor Executives' Ass'n*, 491 U.S. 299, 302-03 (1989).  "Minor disputes" are those "growing out of grievances or out of the interpretation or application of [collective bargaining agreements]" and are committed to the National Railroad Adjustment Board or an arbitration panel created by the parties.  45 U.S.C. § 153.  The dispute here is clearly a "minor dispute."

4

as conveying federal court jurisdiction based on allegations that the railroad initiated disciplinary proceedings against an employee who held union office to "undermine the effectiveness of [the employees' chosen] bargaining agent." *Central of Georgia*, 305 F.2d at 608. Those allegations were sufficient to convey jurisdiction, the Court reasoned, because they implicated the Section 2 Third rights under the RLA and, therefore, were not subject to mandatory arbitration under the statute. *Id.* at 609.

Twenty-seven years later, the Supreme Court in *TWA* substantially narrowed the reach of RLA Sections 2 Third and 2 Fourth (the latter protects employees' rights to bargain collectively "through representatives of their own choosing," 45 U.S.C. § 152 Fourth)—and, by extension, limited the reach of *Central of Georgia*'s holding. The Supreme Court clarified that the RLA's prohibition against interference with employees' designation of a union representative applies "primarily to the **precertification** rights and freedoms of **unorganized employees**." *TWA*, 489 U.S. at 440 (emphasis added). That is, the claims that are properly in federal court are those seeking to protect the right of employees to *form a union in the first place*. Once a union is certified and a CBA exists, only the most extreme antiunion conduct—*i.e.*, conduct that would effectively nullify the arbitration process—has been recognized as the type of statutory violation that would convey federal court jurisdiction. *See Wightman v. Springfield Term. Ry. Co.*, 100 F.3d 228, 234 (1st Cir. 1996) (noting that "the parties already have certified representatives and a collective bargaining

5

record in place" after union certification and, consequently, "[i]n post-certification disputes . . . we must limit our intervention to cases in which the aggrieved union has no other remedy 'to enforce the statutory commands which Congress had written into the [RLA]'" (*quoting TWA*, 489 U.S. at 441)). *Central of Georgia* conflicts with this framework by creating an exception that would destroy the rule that minor disputes are subject to mandatory arbitration. Indeed, a plaintiff could avoid arbitration simply by making facially plausible allegations of anti-union animus.

Decisions following the Supreme Court's *TWA* ruling make clear that *Central of Georgia* is inconsistent with the RLA framework. Chief among these is *National Railroad Passenger Corporation v. International Association of Machinists and Aerospace Workers*, 915 F.2d 43 (1st Cir. 1990) ( "***Amtrak v. IAM***"), in which Judge John R. Brown, the *author* of *Central of Georgia*, observed that, "in light of the Supreme Court's subsequent decisions in *Andrews*[2] and *TWA . . . Central of Georgia* may not give sufficient deference to the importance of preserving the exclusive jurisdiction of the Adjustment Boards in post-certification 'minor disputes' under the RLA." *Amtrak v. IAM*, 915 F.2d at 53 n.15. Recognizing the narrowed scope of Section 2 Third and Fourth claims in the post-certification context, the First Circuit went on to affirm that the disciplinary dispute at issue in that case was subject to

---

[2] *Andrews v. Louisville & Nashville R. Co.*, 406 U.S. 320, 323-24 (1972), held that the RLA conveyed *exclusive* jurisdiction over minor disputes involving employee discipline to the arbitration tribunals. *See Amtrak v. IAM*, 915 F.2d at 50.

mandatory arbitration, *despite* the union's claims that the discipline was motivated by anti-union animus. *Id.* at 52.

Other Courts of Appeals have consistently reached the same result, refusing to allow mere allegations of anti-union animus, without more, to avoid mandatory arbitration of post-certification disputes. *See Bhd. of Maint. of Way Emps. Div./IBT v. BNSF Ry. Co.*, 834 F.3d 1071, 1077 (9th Cir. 2016) ("[The union] cannot merely invoke the general concept of retaliation or corporate action that discourages the filing of grievances in order to evade arbitration."); *United Transp. Union v. Nat'l R.R. Passenger Corp.*, 588 F.3d 805 (2d Cir. 2009) (emphasizing that post-certification Section 2 Third claims are limited to carrier conduct that seeks to undermine the union as a whole); *Ass'n of Flight Attendants v. Horizon Air Indust., Inc.*, 280 F.3d 901, 905 (9th Cir. 2002) (rejecting jurisdiction over union's claim that discipline of employee holding union office for union activity violated Section 2 Fourth); *Indep. Union of Flight Attendants v. Pan Am. World Airways, Inc.*, 789 F.2d 139, 141-42 (2d Cir. 1986) (declining to find jurisdiction over disciplinary dispute related to employee's union activity); *International Ass'n of Machinists & Aerospace Workers v. Northwest Airlines, Inc.*, 673 F.2d 700, 712 (3d Cir. 1982) (holding that allegations that employer discipline was intended to undermine the employees' choice of bargaining representative were insufficient to create federal

7

jurisdiction, and emphasizing that the union's allegations did to not rise to a "general campaign to destroy or undermine [the union]").

Even courts that have referenced "anti-union animus" have relied on extraordinary, narrowly-circumscribed circumstances justifying federal court intervention; mere allegations that employee discipline was motivated by anti-union activity was not sufficient.  Indeed, it must involve conduct so extreme that "the essential framework for bargaining between management and the union has broken down," the carrier's behavior risks "an irreparable injury of a magnitude that would render a decision in favor of the unions virtually meaningless," and the circumstances are such that "the administrative mechanism that Congress confected breaks down." *Ass'n of Professional Flight Attendants v. American Airlines, Inc.*, 843 F.2d 209, 211 (5th Cir. 1988) ("***APFA v. American***"); *see, e.g.*, *Ry. Labor Execs.' Ass'n v. Boston & Maine Corp.*, 808 F.2d 150, 157-58 (1st Cir. 1986) (finding such circumstances where a railroad allegedly targeted 725 strikers for job elimination in retaliation for striking).  No case involving a small local union in a collective bargaining craft of over 5,000 employees, represented by an army of 600 union officials, as this one does, comes close to such a showing.  Thus, as this Court has emphasized, "[i]f the administrative process is available, minor disputes ***must*** be routed through it." *APFA v. American*, 843 F.2d at 211. (emphasis added).

*Central of Georgia*'s expansive view of federal court jurisdiction has been whittled away by sixty years of narrowing by the Supreme Court and further decisions by this Court. But, because it has yet to be formally overruled, it led the Panel to affirm the District Court's exercise of jurisdiction to intervene here despite the fact that, as all parties agree, "the administrative process [remains] available," *id.*, and nothing in the record suggests that the railroad's action had any effect on BLET's ability to continue representing its members. Because this result is fundamentally inconsistent with this decisions of the Supreme Court, this Court, and its sister Circuits, *Central of Georgia* should be overruled.

### B.     A Freestanding "Animus Exception" Would Create a Circuit Split

Even if reconsideration of *Central of Georgia* were not warranted, rehearing en banc would still be appropriate because the Panel's decision in this case creates a circuit split by creating a freestanding "animus exception" to the RLA requirement that minor disputes be subject to mandatory administrative arbitration. This "animus exception," as described by the Panel, represents a dramatic break from established RLA jurisprudence and would gut Congress's regulatory scheme.

The Panel held that minor disputes are within the jurisdiction of the federal courts so long as they "alleg[e] that railroad conduct motivated by antiunion animus is interfering with the employees' 'choice of representatives.'" Op. at 12. The Panel reasoned that such claims can be heard in federal court because they stem from

Section 2's statutory right to "noninterference with employees' chosen representation." *Id.* at 7. And it concluded that the dispute here raises such an animus claim because the employees were officers of the union's local division whom, the union alleged, were targeted for discipline in a "plot to inhibit the employees' ability to act as union representatives."[3] *Id.* at 8.

This holding represents a dramatic overhaul of the RLA. The RLA requires mandatory arbitration so long as the administrative process is available, with only the most limited exceptions. *See APFA v. American*, 843 F.2d at 211. The Courts of Appeals have never held that an allegation that disciplinary action was motivated by an employee's union activity, *without more*, falls into such an exception. To the contrary, the case law is clear that a carrier's anti-union conduct must be so extreme as to amount to an attack on the existence of the union itself as a bargaining

---

[3] The Panel appeared to consider the discipline of the local's officers as interference with their ability to act as "union representatives." Op. at 8. The Panel further noted that Appellants had not identified any authority explicitly stating that animus against a union local cannot amount to interference. Op. at 14. No such authority exists, however, because the law is clear that the RLA requires certification of a single, system-wide representative of an entire craft or class—*i.e.*, the union as a whole. *See United Transp. Union*, 588 F.3d at 812 (noting "the term 'representative'" in Sections 2 Third and Fourth "refers to the *union* or other *organization* designated to represent an employee, not merely to an individual official within that organization"); *Grand Trunk Western R.R. Co.*, 12 NMB 228, 234 (June 27, 1985). There was nothing in the record to suggest that the local officers—who indisputably have no role in any bargaining on behalf of the union— were disciplined to prevent BLET from representing Union Pacific employees, or that the railroad's action threatened BLET as a whole.

representative, or so disruptive to the functioning of the union as to render the arbitration process meaningless. Only then can a minor dispute be heard in federal court. Short of such extraordinary circumstances, "minor disputes **must** be routed through [the administrative process]" as long as it "is available." *Id.* (emphasis added). The Panel's "animus exception" turns that rule on its head.

The consequences of the Panel's holding would be extraordinary. The unbridled "animus exception" the Panel created would eliminate any real barrier to federal court jurisdiction for post-certification RLA claims and flood the courts in this Circuit with new federal litigation.

The Panel's new exception ignores the historical and statutory features that set the RLA apart from other areas of labor law. In establishing the RLA, Congress intentionally did not enact the kinds of labor regulations it created in other areas of the workforce. Recognizing the historic strength of railroad unions, Congress limited the courts to protecting employees' rights to form or join unions, establishing mandatory arbitration to adjudicate disputes arising from the terms of CBAs. *See Johnson v. Express One Int'l, Inc.*, 944 F.2d 247, 252-53 (5th Cir. 1991) (reviewing railroad unions' historic strength that informed Congress's unique choices in the RLA).

A key feature of this unique scheme is that Congress *declined* to create federal protections against "unfair labor practices," writ large, in contrast with the National

Labor Relations Act (the "**NLRA**"), 29 U.S.C. §151 *et. seq.*  Nor did Congress create an administrative agency such as the National Labor Relations Board ("**NLRB**") to adjudicate such claims.  Instead, federal courts are available to protect *unrepresented* workers *before* a union is certified; anything else that *can* be arbitrated under a CBA, *must* be.  *See Union Pac. R.R. Co. v. Sheehan*, 439 U.S. 89, 94 (1978) ("Congress considered it essential to keep . . . 'minor' disputes within the Adjustment Board and out of the courts.").

By allowing any claim fairly pleaded as one of "antiunion animus," without more, into federal court, the Panel has effectively rewritten the RLA to eviscerate that Congressional choice.  Rather than reserving federal court as a forum of last resort for minor disputes, the decision will turn this Circuit's district courts into the primary adjudicators of disciplinary disputes between carriers and their employees. The pressure on the federal docket will be even greater here than it is under the NLRA: while the NLRB can elect to "defer" unfair labor practice grievances to voluntary arbitration, *see United Parcel Service, Inc.*, 369 N.L.R.B. No. 1 (Dec. 23, 2019), no such rule exists under the RLA.  Indeed, the fact that it does not exist lends further support to the premise that Congress did not intend for federal courts to have jurisdiction over minor disputes in the first place.

The Panel's "animus exception" will swallow the rule, flooding the federal courts in this Circuit with labor litigation that Congress "considered . . . essential to

keep . . . out of the courts." *Sheehan*, 439 U.S. at 94. Because this doctrine would represent a radical change to the statutory scheme, and because the Panel's "animus exception" is predicated on an outdated decision that is no longer viable, the Court should reconsider it en banc before enshrining it as the rule in this Circuit.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant rehearing en banc, vacate the district court's injunction, and remand with instructions to dismiss the case for lack of subject matter jurisdiction.

Dated: April 27, 2022                Respectfully submitted,

*/s/ Robert S. Hawkins*
COZEN O'CONNOR
Robert S. Hawkins (*counsel of record*)
Andrew J. Rolfes
Michael B. de Leeuw
1650 Market Street, Suite 2800
Philadelphia, PA 19103
Phone: (215) 665-2015
E-mail: rhawkins@cozen.com
E-mail: arolfes@cozen.com

*Attorneys for Appellant*
*Union Pacific Railroad Company*

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 27, 2022, a true and correct copy of the foregoing Petition for Rehearing En Banc was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system.  Participants in this case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

Upon acceptance by the Court of the electronically filed document, 20 paper copies will be filed with the Court within the time provided in the Court's rules via Federal Express.

Dated: April 27, 2022                    By:  */s/ Robert S. Hawkins*

                                        Robert S. Hawkins

## **CERTIFICATE OF COMPLIANCE**

1.      This document complies with the word limit of Fed. R. App. P. 35(b)(2)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and in accordance with Fifth Cir. R. 35.5, this document contains 3,528 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in proportionally spaced typeface using Microsoft Word 2016 in 14-point, Times New Roman font.

Dated: April 27, 2022                                   By: */s/ Robert S. Hawkins*
                                                                  Robert S. Hawkins

**ADDENDUM**

# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 13, 2022

Lyle W. Cayce
Clerk

No. 21-50544

Brotherhood of Locomotive Engineers and Trainmen,

*Plaintiff—Appellee,*

*versus*

Union Pacific Railroad Company,

*Defendant—Appellant.*

Appeal from the United States District Court
for the Western District of Texas, El Paso
USDC No. 3:21-CV-122

Before Dennis, Higginson, and Costa, *Circuit Judges.*
Gregg Costa, *Circuit Judge*:

The Railway Labor Act divests federal courts of jurisdiction over minor disputes between rail carriers and their employees. Most claims challenging employee discipline qualify as minor disputes that must be routed through arbitration. But there are exceptions. One is that the Act gives federal courts the authority to remedy carrier conduct motivated by antiunion animus. The district court found that this was such a case, preliminarily enjoining the railroad's suspension of six union members—including all five actively-employed officers of the union's local division—

over a fistfight at an offsite union meeting.  Our primary question is whether the animus exception gave the district court jurisdiction to intervene.

I

Union Pacific is a national rail carrier operating in the western half of the United States.  The Brotherhood of Locomotive Engineers and Trainmen is a labor union representing over 5,000 Union Pacific engineers.  The union is made up of a number of local units or "divisions."  Each provides representation to union members in its area.  Elected representatives from each division also serve on general committees, which together negotiate collective bargaining agreements (CBAs) with carriers like Union Pacific.

Division 192 is the exclusive representative for Union Pacific employees in and around El Paso.  During early 2021, tension arose within the division over the union's stance on "shoves."  Engineers take shoves when they accept extra shifts at the request of the railroad.  The CBA does not prohibit shoves, but the union views them as a safety risk and has asked its members to decline them.  Not all of the division's members complied. One engineer in particular, David Cisneros, continued taking shoves.  Two Division 192 officers—Local Chairman Peter Shepard and Vice Local Chairman Joe Reyes—confronted Cisneros about his behavior via text message and the division's Facebook page.

Mounting tensions ultimately erupted into an off-duty fist fight before a union meeting.  Details about the fight are disputed but the record largely establishes the following.[1]

---

[1] As the district court explained, the particulars of the fight are not material.  The union's RLA claim turns on undisputed facts about Union Pacific's response to the fight.

On March 9, 2021, Division 192 held a routine union meeting at a local restaurant. Cisneros arrived at the restaurant a half hour before the start time. A number of the division's officers, including Shepard and Reyes, had already arrived and were chatting in the parking lot. Cisneros approached Reyes and struck him repeatedly until he fell to the ground. Shepard and other division members attempted to separate the parties and a shouting match ensued. In the tumult, Cisneros crossed back over to Reyes, who had just risen to his feet, and punched him until he collapsed again. The two were finally separated and the union meeting took place without Cisneros or Reyes.

Almost two months later, on May 5, Cisneros filed a complaint with Union Pacific, alleging that he had been threatened and physically assaulted by Shepard and Reyes in retaliation for taking extra shifts. A company supervisor met with Cisneros about the incident and took statements from only two other employees: Jason Barnett and Mark Fraire. Barnett wrote that he had witnessed part of the altercation at the union meeting and helped to diffuse the situation. Fraire was not present for the fight but said that he also took shoves and had been subject to similar harassment by Reyes.

About a week later, Union Pacific indefinitely suspended Shepard and Reyes without pay. It also suspended three other officers of Division 192 and one more union member. Cisneros's initial report to Union Pacific did not allege that those four were directly involved in the fight, and it appears they were simply bystanders. Union Pacific did not take statements from any of the suspended union members before disciplining them.

Notices of Investigations issued to all six individuals, telling them that they would be subject to disciplinary proceedings that could result in termination. Shepard and Reyes were charged with violating two Union Pacific policies: Item 10-I (forbidding "Violence & Abusive Behavior in the

Workplace") and Rule 1.6 (forbidding "Discourteous," "Immoral," and "Quarrelsome" behavior). The bystanders were charged with violating Rule 1.6—in their case, for "fail[ing] to take any action" to stop the fight or "report the incident" to management.

Cisneros was not suspended or issued a notice, even though it is Union Pacific's policy to discipline every participant in a physical altercation. Union Pacific also declined to discipline Barnett, who gave a statement in support of Cisneros's claim, although he had not made any earlier efforts to report the incident.

The suspension of six union members—five of whom held office—effectively barred all of Division 192's leadership from Union Pacific's premises.[2] The suspended officers later testified that this damaged Division 192 because they could not perform most duties remotely.

Within days of the suspensions, the union sued Union Pacific in federal court. It alleged that Union Pacific was retaliating against the union for its shove policy by debilitating the union officers who sought to enforce it. This retaliation, the union argued, violated the section of the Railway Labor Act (RLA) that prohibits carrier interference with union activity. The union sought injunctive relief requiring Union Pacific to end its investigation of the suspended employees and ordering their return to work. Union Pacific responded with a motion to dismiss for lack of subject matter jurisdiction, arguing that the dispute needed to be arbitrated.

The district court held a preliminary injunction hearing. The union introduced the testimony of two suspended union members and the General Chairman of its western territory, as well as a number of documents. Union

---

[2] The only remaining union officer, Steve Seale, was on medical leave at the time.

Pacific offered, among other things, the testimony of Cisneros and two Union Pacific supervisors involved in the disciplinary action. The day after the hearing, the court granted a preliminary injunction, finding a "strong likelihood" the union would prevail in showing that Union Pacific violated the RLA.

Union Pacific immediately appealed the injunction and unsuccessfully sought a stay in this court.

Meanwhile, the district court denied Union Pacific's motion to dismiss for lack of jurisdiction. It acknowledged that the RLA precludes federal jurisdiction over minor disputes between carriers and their employees. But it concluded that Union Pacific had used its disciplinary proceedings "as pretext for undermining" the union. The case thus presented, in the court's view, an "exceptional circumstance" of antiunion animus in which federal court jurisdiction exists.

## II

The first question is whether the district court had jurisdiction. *See Jefferson Cmty. Health Care Ctrs., Inc. v. Jefferson Par. Gov't*, 849 F.3d 615, 621 (5th Cir. 2017) (addressing jurisdiction in appeal of preliminary injunction).

Congress enacted the RLA to minimize disruptions to railway service caused by labor disputes. *See Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1994). The Act establishes distinct procedures for resolving "major" and "minor" disputes between carriers and their employees. *Id.* at 252–53. "Major disputes," which relate to the collective bargaining process, give rise to federal court jurisdiction. *See Conrail v. Railway Labor Executives' Association*, 491 U.S. 299, 302–03 (1989); *see also Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711, 723 (1945) (describing major disputes as ones that

"relate[] to disputes over the formation of collective agreements or efforts to secure them").  On the other hand, most "minor disputes" or grievances must be arbitrated before administrative bodies called Adjustment Boards. *Conrail*, 491 U.S. at 303–04.  Minor disputes typically involve "the interpretation or application of agreements concerning rates of pay, rules, or working conditions." *Conrail*, 491 U.S. at 303.  The "distinguishing feature" of a minor dispute is that it "may be conclusively resolved by interpreting the existing agreement." *Id.* at 305.

Not all disputes that might be governed by an existing CBA require arbitration.  Federal courts sometimes have a role, such as when carriers act out of "anti-union animus." *Association of Professional Flight Attendants v. Am. Airlines, Inc.*, 843 F.2d 209, 211 (5th Cir. 1988); Douglas Hall et al., The Railway Labor Act, § 5.III.A (4th ed. 2016) (explaining that, once a CBA is in place, "courts exercise jurisdiction principally to address claims that carrier actions reflect antiunion animus or undermine the effective functioning of the union or cannot be adequately remedied by administrative means").  The animus exception encompasses direct attacks on the union, as well as more clandestine attempts to punish employees for their union associations.  *See, e.g.*, *Air Line Pilots Association, International v. Transamerica Airlines, Inc.*, 817 F.2d 510, 515–17 (9th Cir. 1987) (carrier's diversion of business to a newly established non-union subsidiary); *Railway Labor Executives' Association v. Bos. & Me. Corp.*, 808 F.2d 150, 157–58 (1st Cir. 1986) (discriminatory treatment of every employee who chose to strike); *Conrad v. Delta Air Lines, Inc.*, 494 F.2d 914, 918 (7th Cir. 1974) (retaliatory discharge of a single employee).

The animus exception is rooted in Section 2 of the RLA, which provides that no carrier "shall in any way interfere with, influence, or

coerce" the employees in their "choice of representatives."[3]  45 U.S.C. § 152.  That requirement and similar provisions of the RLA are judicially enforceable because noninterference with employees' chosen representation is a statutory right crucial to the Act's functioning. *Virginian Ry. Co. v. System Federation*, 300 U.S. 515, 545–46 (1937); *Tex. & N. O. R. Co. v. Brotherhood of Railway & Steamship Clerks*, 281 U.S. 548, 569 (1930).

We first addressed the animus exception sixty years ago. *See Brotherhood of Railroad Trainmen v. Cent. of Ga. Ry. Co* ("*Central of Georgia*"), 305 F.2d 605 (5th Cir. 1962).  A railroad had started disciplinary proceedings against an employee who was a local union representative, alleging that his efforts to encourage other employees to pursue workers' compensation claims constituted "gross disloyalty." *Id.* at 606.  The union sought a federal court injunction, claiming the railroad was (1) violating the employee's contractual rights by disciplining him for conduct that was not prohibited by the CBA and (2) interfering with the union by using a baseless charge as pretext to terminate the employee "and thereby to disqualify him as a representative." *Id.* at 606–07.  We explained that the district court lacked jurisdiction over the first claim because it could be resolved by interpreting the employee's "personal rights" under the CBA and was thus a minor dispute. *Id.* at 607.  In contrast, federal court jurisdiction existed over the claim that the railroad was "frustrat[ing] and undermin[ing] the effectiveness of [the] bargaining agent by securing his discharge for unfounded, false or baseless charges." *Id.* at 608–09.  If it was true that the railroad had used its "disciplinary proceedings as a guise for . . . undermining the effectiveness of the Brotherhood," then the railroad had "obviously"

---

[3] Applying the animus exception, courts look to the third subpart of Section 2 (cited above), as well as the fourth subpart, which protect employees' right to organize and operate their union free from carrier interference. *See* 45 U.S.C. § 152.

violated Section 2, Third, of the RLA. *Id.* at 609. In that case, a federal court injunction would be "appropriate if not compelled." *Id.*; *see also Steele v. Louisville & N. R. Co.*, 323 U.S. 192, 207 (1944) (finding injunctive relief appropriate to remedy conduct that undermined the RLA's bargaining scheme).

*Central of Georgia* looks a lot like this case. The suspended employees are elected officers of their local union division, who were disciplined after attempting to persuade their peers to adopt a pro-union position in a policy dispute. The employees are charged with violating vague provisions of the carrier's code of conduct. And once again the union alleges that the charges are pretext for a plot to inhibit the employees' ability to act as union representatives and thereby weaken the union.

Despite the similarities, Union Pacific argues that *Central of Georgia* is not controlling because its holding was diluted, if not entirely gutted, by *Trans World Airlines, Inc. v. Independent Federation of Flight Attendants*, 489 U.S. 426 (1989) ("*TWA*"). *TWA* clarifies that Section 2, Fourth, of the RLA addresses "primarily the precertification rights and freedoms of unorganized employees" and is not usually grounds for judicial intervention once the union has been certified. *Id.* Union Pacific reads this as meaning *Central of Georgia* no longer applies to animus claims raised by certified unions.

Union Pacific overstates the impact of *TWA* on *Central of Georgia* and its kin. Soon after *TWA* issued, we reiterated that "actions taken by a carrier for the purpose of weakening or destroying the union" remain a "special circumstance[] in which federal courts may assert jurisdiction over cases that would otherwise involve minor disputes." *Brotherhood of Railway. Carmen v. Atchison, T. & S. F. R. Co.*, 894 F.2d 1463, 1468 n.10 (5th Cir. 1990) (citing *Central of Georgia*, 305 F.2d at 608–09). In line with that reaffirmation, district courts in this circuit continue to apply *Central of Georgia*. *See*

*CareFlite v. Office and Professional Employees. International Union*, 766 F. Supp. 2d 773, 778–79 (N.D. Tex. 2011); *PHI, Inc. v. Office & Professional Employees Internationl Union*, 2007 U.S. Dist. LEXIS 85085, at *21–27 (W.D. La. Nov. 16, 2007).  Other circuits to address the animus exception since *TWA* have recognized its vitality.[4]  *See Stewart v. Spirit Airlines, Inc.,* 503 F. App'x 814, 819 (11th Cir. 2013); *United Transportation Union v. AMTRAK*, 588 F.3d 805, 813 (2d Cir. 2009); *Wightman v. Springfield Terminal Ry.*, 100 F.3d 228, 234 (1st Cir. 1996); *Fennessy v. Sw. Airlines*, 91 F.3d 1359, 1362–63 (9th Cir. 1996); *Brotherhood of Locomotive Engineers v. Kan. City S. Ry.*, 26 F.3d 787, 795 (8th Cir. 1994); *Davies v. Am. Airlines, Inc.*, 971 F.2d 463, 468 (10th Cir. 1992); *but see IBT v. UPS Co.*, 447 F.3d 491, 502 (6th Cir. 2006) (acknowledging other circuits' adoption of the animus exception but reserving the issue for a future case).  The treatise focused on the RLA also recognizes that courts can exercise jurisdiction over a disciplinary proceeding that "raises issues that can be resolved by interpretation of a [CBA]" if "the plaintiff can demonstrate antiunion animus or antiunion discrimination."

---

[4] In the immediate aftermath of *TWA*, one circuit opinion suggested that the Supreme Court decision might affect the animus doctrine. *Central of Georgia*'s author, Judge Brown, wrote an opinion as a visiting judge on the First Circuit, wondering whether his earlier ruling gave "sufficient deference" to the RLA's preference for arbitration in the postcertification context. *Nat'l R. Passenger Corp. v. International Association of Machinists & Aerospace Workers*, 915 F.2d 43, 53 n.15 (1st Cir. 1990).  But Judge Brown's reservations did not gain traction in the courts.  As mentioned above, courts (including the First Circuit) and commentators continue to recognize that the animus exception applies to postcertification disputes. *See, e.g.*, *Wightman v. Springfield Terminal Ry.*, 100 F.3d 228, 234 (1st Cir. 1996) ("[W]e will intervene [in postcertification disputes] upon demonstration of carrier conduct reflecting anti-union animus, an attempt to interfere with employee choice of collective bargaining representative, discrimination, or coercion.").  Indeed, the Second Circuit has persuasively explained that *TWA* is consistent with the well-recognized principle that antiunion animus is one of the few circumstances in which "a postcertification suit may be brought in federal court." *See United Transportation Union v. AMTRAK*, 588 F.3d 805, 813 (2d Cir. 2009).

Hall et al., *supra*, at § 5.III.D.4; *see also* ALI-ABA Continuing Legal Education, *Judicial Enforcement of the Railway Labor Act*, SS051 ALI-ABA 483, 501 (2011) ("Courts have jurisdiction over adequately pleaded coercion claims and may grant injunctive relief, notwithstanding the existence of a minor dispute, if such claims are borne out by the facts.").

It makes sense that no court has read *TWA* as overriding the animus exception. A Supreme Court decision overrules circuit precedent only when it does so "unequivocal[ly]." *United States v. Alcantar*, 733 F.3d 143, 146 (5th Cir. 2013). *TWA* did not involve any claim that a carrier had hidden an attempt to weaken a union behind a facially minor dispute. The *TWA* parties had just concluded a very public battle over the terms of their new CBA. *See* 489 U.S. at 429. They had already exhausted the administrative procedures mandated by the RLA and, at that the stage, the Court held only that the Act did not prohibit the carrier's adoption of self-help measures, which were not "inherently destructive" of union activity or the framework of the RLA. *See id.* at 442. *TWA* did not address a situation in which there was "discrimination or coercion against the representative," which can result in a breakdown of the "essential framework for bargaining." *See Association of Professional Flight Attendants*, 843 F.2d at 211. Nor was it interpreting Section 2, Third, of the RLA—the provision we applied in recognizing the animus exception. *See Central of Georgia*, 305 F.2d at 608.

Animus claims like the one at bar may be litigated in federal court because they cannot "be conclusively resolved" by interpreting or applying a CBA. *See Conrail,* 491 U.S. at 305; *Andrews*, 406 U.S. at 324 (qualifying an employee's wrongful discharge claim as a minor dispute because it "stem[med] from differing interpretations of the collective-bargaining agreement"). Unlike an employee's "personal" claim challenging discipline, which can be fully resolved by interpreting and applying the CBA and thus must be arbitrated, *see Central of Georgia*, 305 F.2d at 607–08, the

animus claim is a statutory right neither created nor defined by the parties' contract. The question to be answered in this case, for example, is whether the railroad interfered with the employees' choice of representation. 45 U.S.C. § 152. That is a statutory question, not a contractual one. The Supreme Court has long recognized that "but for the general jurisdiction of the federal courts there would be no remedy to enforce the statutory commands which Congress has written into the Railway Labor Act." *Switchmen's Union of N. Am. v. Nat'l Mediation Bd.*, 320 U.S. 297, 300 (1943). It has confirmed that principle since *TWA*, explaining that "the RLA's mechanism for resolving minor disputes does not pre-empt causes of action to enforce rights that are independent of the CBA." *Hawaiian Airlines*, 512 U.S. at 256; *see also Fennessy*, 91 F.3d at 1362 (finding judicial enforcement of animus claims to be consistent with *Hawaiian Airlines*).[5]

Union Pacific also argues that "[a] preliminary injunction may be issued in a case involving a minor dispute only in exceptional circumstances." *See Allied Pilots Association v. Am. Airlines, Inc.*, 898 F.2d 462, 465 (5th Cir. 1990) (instructing that injunctions should only be granted in minor disputes "where necessary to preserve the jurisdiction of the grievance procedure, or where a disruption of the status quo would result in irreparable injury . . ." (quoting *IBT, Local 19 v. Sw. Airlines Co.*, 875 F.2d 1129, 1136 (5th Cir. 1989)). But this is just another way of framing the RLA's general prohibition against judicial intervention in minor disputes. We have

---

[5] In cases declining to apply the animus exception, the proper interpretation of a CBA term was "[t]he crux of the dispute." *See, e.g., Am. Airlines*, 843 F.2d at 212 (qualifying a dispute over a carrier's refusal to let employees wear a controversial button as minor because it turned on the meaning of the dress code in the CBA); *Brotherhood of Railway Carmen*, 894 F.2d at 1467 (affirming dismissal of a claim about a carrier's voluntary resignation program because it "turn[ed] on interpretation of the contractual agreements between the parties").

explained that antiunion animus is one of the "exceptional circumstances" that warrants federal jurisdiction. *Brotherhood of Railway Carmen*, 894 F.2d at 1468 n.10. Indeed, the district court deemed Union Pacific's selective discipline suspending five division leaders an "exceptional circumstance" warranting court intervention. And, once a court has jurisdiction to intervene in a dispute governed by the RLA, there is no heightened standard for injunctive relief. *See Conrail*, 491 U.S. at 302–03 (explaining that violations of the statutory requirements of the RLA may be enjoined "without the customary showing of irreparable injury").[6]

Federal courts thus have jurisdiction over postcertification disputes alleging that railroad conduct motivated by antiunion animus is interfering with the employees' "choice of representatives."[7] *See* 45 U.S.C. § 152; *Central of Georgia*, 305 F.2d at 608–09.

---

[6] Union Pacific also maintains that the Norris-LaGuardia Act (NLGA) prohibits courts from granting injunctions in labor disputes without first finding the enjoined action would cause "substantial and irreparable injury" to the moving party. 29 U.S.C. § 107(b). But the NLGA "expresses a basic policy against the injunction of activities of labor unions. . . . [It] does not deprive the federal courts of jurisdiction to enjoin compliance with various mandates of the Railway Labor Act." *Chi. & N. W. Ry. Co. v. United Transportation Union*, 402 U.S. 570, 581 (1971). To accommodate the "competing demands" between these statutes, the Supreme Court and this court have repeatedly held that courts enforcing the RLA are not required to follow the NLGA's procedures. *See, e.g.*, *Burlington N. R.R. Co. v. Brotherhood of Maintenance of Way Employes*, 481 U.S. 429, 445 (1987); *BNSF Ry. Co. v. SMART*, 973 F.3d 326, 338 (5th Cir. 2020).

[7] Of course, jurisdiction does not depend on the claim being successful. A plaintiff need only allege a "colorable" claim over which there is federal jurisdiction to allow a federal court to decide the dispute. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 513 (2006); *see OJSC Ukrnafta v. Carpatsky Petrol. Corp.*, 957 F.3d 487, 496 (5th Cir. 2020) ("[T]he plaintiff need not, and often will not, succeed on the federal claim for a federal court to be able to decide it."); *see also Central of Georgia*, 305 F.2d at 609 (recognizing that federal district court had jurisdiction over animus claim and remanding so it could consider whether union proved that claim).

## III

That leaves the factbound question of whether Union Pacific engaged in that unlawful interference when it suspended the five union officers. We review the grant of a preliminary injunction for abuse of discretion. *See Basinkeeper v. U.S. Army Corps of Eng'rs*, 894 F.3d 692, 696 (5th Cir. 2018). Factual findings that support the injunction are reviewed for clear error while legal rulings are reviewed *de novo*. *See id.* Deference is especially warranted on the question of antiunion animus. *See Independent Union of Flight Attendants v. Pan Am. World Airways, Inc.*, 789 F.2d 139, 143 (2d Cir. 1986) (noting reluctance "to overturn district court findings as to motive or intent" in this area).

Although the district court found all elements of a traditional preliminary injunction satisfied, Union Pacific focuses only on whether the union showed a substantial likelihood of success on its interference claim. And most of its challenge to substantial likelihood of success is rooted in the jurisdictional argument we have already addressed. Beyond the jurisdictional issue, the propriety of the injunction largely boils down to a factual dispute: Did the district court abuse its discretion in concluding that the disciplining of six union members, including five officers, likely was pretext for the railroad's efforts to "interfere with, influence, or coerce" employees in their choice of representatives. 45 U.S.C. § 152 (Third).

We see no abuse of discretion. The district court concluded that the union was likely to succeed in showing that the discipline was "motivated by a desire to weaken the local division." The following facts amply support that determination: (1) Union Pacific indefinitely suspended all of Division 192's active-duty leadership because of a dispute they had with an employee who favored the company's position in a policy dispute; (2) Union Pacific premised the discipline on a fight that occurred off-duty and outside the

workplace, even though four of the suspended union officials did not participate in the fight; (3) the pro-company employee who started the fight was not disciplined, despite the company's policy of disciplining all participants in a physical altercation; and (4) Union Pacific took a statement from the pro-company employee but did not take a statement from the union officials before suspending them.  Indeed, the railroad's suspension of effectively all of Division 192's elected leadership presents a much stronger case of interference with the employees' choice of representatives than the case recognizing such a claim.  *Contrast Central of Georgia*, 305 F.2d at 609 (recognizing that pretextual disciplining of even one employee can state an interference claim); *see also Conrad*, 494 F.2d at 918 ("Anti-union motivation invalidates even a discharge which could be justified on independent grounds.").

Unable to dispute most of these facts, Union Pacific argues that an interference claim needs to undermine the entire union, not just a local unit like Division 192.  No authority supports that view.  Before and after *TWA*, courts exercised jurisdiction over interference claims involving disciplinary actions that targeted an individual union representative or a particular union branch.  *See, e.g.*, *Central of Georgia*, 305 F.2d at 606; *Conrad*, 494 F.2d at 918; *Fennessy*, 91 F.3d at 1363.  Nor does the RLA's text create a national/local distinction.  It says that carriers shall not "seek in any manner" to interfere with employees' "choice of representatives"; there is no mention of particular offices or duties those representatives must have. 45 U.S.C. § 152(3).

The district court did not abuse its discretion in concluding that the union is likely to prevail in showing that Union Pacific's suspension of effectively all the division's elected representatives amounted to the interference the RLA prohibits.

No. 21-50544

* * *

We AFFIRM the injunction.